**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 2 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT CACY,

      Plaintiff - Appellant,

    v.

CITY OF CHICKASHA, OKLAHOMA,
a municipal corporation; DANNY
STERLING; GARY BRAY, City of
Chickasha Police Captain, in his official
and individual capacity; J. D. HUGGINS,
City of Chickasha Police Captain, in his
official and individual capacity; LARRY
SHELTON, City of Chickasha City
Manager, in his official and individual
capacity,

      Defendants - Appellees.

No. 96-6211
W.D. Oklahoma
(D.C. No. CIV-95-680-L)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **BALDOCK**, and **EBEL**, Circuit Judges.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After resigning from his position as a police lieutenant for the City of Chickasha, Oklahoma, Robert Cacy brought an action under 42 U.S.C. § 1983, alleging that the City of Chickasha, Chief of Police Dany Sterling, Captain Gary Bray, Captain J.D. Huggins, and City Manager Larry Shelton (defendants) deprived him of liberty and property without due process of law in violation of his rights under the Fourteenth Amendment. Mr. Cacy also brought state law claims for intentional and negligent infliction of emotional distress. The district court granted defendants' motion for summary judgment, concluding that no due process violation occurred because Mr. Cacy voluntarily resigned, and no defendant made any public false statements about him or his resignation. The district court also dismissed Mr. Cacy's state law claims without prejudice. Mr. Cacy appeals that judgment. We affirm.

## I. BACKGROUND

Mr. Cacy served twenty-two years on the police force in the City of Chickasha until he resigned on January 4, 1994. At all times relevant to this appeal, the individual defendants were also employees of the City of Chickasha: Larry Shelton was the City Manager; Dany Sterling was the Chief of Police; Gary Bray and J.D. Huggins were both police captains.

On November 18, 1993, Captain Bray notified Mr. Cacy that he was investigating the alleged misconduct of a police officer, and that Mr. Cacy would be interviewed as

-2-

part of the investigation.  Captain Bray and Captain Huggins then interviewed Mr. Cacy and his partner, Officer Jeff McCaskill, concerning an incident earlier that year involving a young woman named Theresa Manuel.  In their interviews, as well as their affidavits before the district court, Mr. Cacy and McCaskill described the incident as follows.  The officers were taking a break in the local Best Western coffee shop between 1:00 and 2:00 a.m., after the shop had closed. They were alone with Ms. Manuel, a twenty-year-old friend of McCaskill.[1]  In the course of conversation with her, Officer McCaskill warned Ms. Manuel of a crackdown on underage drinking.  McCaskill was also joking with Ms. Manuel about her attire, pointing out that her pink bra strap was exposed.  Mr. Cacy commented that the strap looked like a bathing suit top, and McCaskill asked whether it was pink all over.  Then Ms. Manuel, without encouragement or enticement, "unexpectedly stands and quickly raises and lowers her top, exposing the lower portion of the bra and in the same moment says, 'What do you think.'"  See Appellant's App. Tab G, at 2 (Cacy Aff.); see also id. Tab H (McCaskill Aff.); id. Tab K, at 2 (Cacy Interview); id. Tab L, at 10 (McCaskill Interview).  McCaskill and Mr. Cacy then left the coffee shop,

---

[1]Officer McCaskill explains why Ms. Manuel was present in the coffee shop as follows:

> She just stopped by there, she had started stopping by there, she's a friend, kind of a friend, of a friend, of a friend kind of like deal and she's saw (sic) the cars setting there one night about two nights before and just walked in and sat down, I would like to have a cup of coffee.

Appellant's App. Tab J, at 5.

"with Cacy lecturing McCaskill on the point that horseplay with friends in public can lead to trouble." Appellant's Br. at 5.

The defendants offer a different version of the incident based on information obtained during the internal affairs investigation. Although Mr. Cacy disputes the defendants' version of this incident, he does not dispute that Ms. Manuel met with Captain Bray in the course of the investigation and described the incident as follows:

Manu[e]l:    [Officers Cacy and McCaskill] said we'll exchange the information [about the crackdown on underage drinking] after you show us your bra and I said okay.
Bray:    Both of them said that or?
Manu[e]l:    No, just McCaskill.
Bray:    Okay, just McCaskill said he would, he would give you the information if you would show him your bra.
Manu[e]l:    Uh huh.
            ***
Manu[e]l:    Cacy wasn't egging anything on or anything like that, but he kept saying, this information could be very valid to you, could be helpful to you, that's all he kept saying was that this information could be helpful to you, that was it.

Appellant's App. Tab I, at 3.

Mr. Cacy also does not dispute that the internal affairs investigation included a clandestinely-recorded conversation between Officer McCaskill and another police officer, Kevin Callahan, which occurred immediately after the coffee shop incident. The substance of that conversation is as follows:

Callahan:    So how do we convince [Ms. Manuel] of doing what she did?
McCaskill:    Oh, we can talk to her,
Callahan:    Cacy played a big part in this?
McCaskill:    Oh, yeah, big part.

-4-

| | |
|---|---|
| Callahan: | Oh. Has he got any lines? |
| McCaskill: | Huh? |
| Callahan: | Does he got any line? |
| McCaskill: | Oh, hell, he's so full of bullshit it is unbelievable. |
| Callahan: | Now this is old man Cacy we're talking about. |
| McCaskill: | We're talking about Lt. Robert Cacy. |
| Callahan: | Oh. And she did this in front of him? |
| McCaskill: | And me. Stood right up there beside the table and said okay, here we go, that's all you get to see. |
| Callahan: | What color of brassiere? |
| McCaskill: | Pink |

\*\*\*

| | |
|---|---|
| Callahan: | Old man's got some lines huh? |
| McCaskill: | Yeah, he threw a couple of lines, a pretty good one. |
| Callahan: | Pretty good. |
| McCaskill: | He goes, he goes well is this like a see through bra or something, she says no, he said well it's just like looking at a bathing suit then, are you ashamed to be out in a bathing suit, well no. |

\*\*\*

| | |
|---|---|
| McCaskill: | So anyway, she a, don't say nothing to her cause I'm going to try to get her to do it again. Later. |
| Callahan: | See ya. |

Id. Tab L, at 4-5. These descriptions of the incident are important not for the truth of the

statements, but because the police department and district attorney's office relied on the

information provided as the basis for threatening Mr. Cacy with termination and criminal

charges.

Captain Bray gave the results of his investigation to Assistant District Attorney

Robert Beal, who informed Bray that it appeared "a crime had been committed, and that

[he] believed criminal charges could be filed against [Mr. Cacy]." Id. Tab Q.[2] During a subsequent meeting attended by Beal, Captain Bray, Chief Sterling, and District Attorney Gene Christian, Beal repeated his opinion that criminal charges could be filed against Mr. Cacy. Id. After receiving this opinion from Beal, Bray and Huggins again met with Mr. Cacy. The parties dispute exactly what was said at the meeting,[3] but Mr. Cacy alleges that Captain Bray told him, "if [he] didn't resign immediately [he] would have criminal charges brought against [him]" id. Tab G, at 3, and that "[i]f the Police Department was not able to clean up their (sic) own house, [Beal] would file charges on [Cacy]." Id. Tab T, at 2 (Cacy Dep.). Upon Mr. Cacy's request, Captain Bray called the Oklahoma Police Pension Board during the meeting to inquire about Mr. Cacy's pension benefits. After

---

[2]The criminal charges were based on Okla. Stat. tit. 21, § 382, which provides:

> "Every . . . public officer, . . . including peace officers and any other law enforcement officer, . . . who corruptly accepts or requests a gift or gratuity, or a promise to make a gift or a promise to do an act beneficial to such officer, . . . shall forfeit his office, be forever disqualified to hold any public office, trust, or appointment under the laws of this state, and be punished by imprisonment . . . or by fine . . . and imprisonment."

They were also based on Okla. Stat. tit. 21, § 1021, which provides:

> "Every person who willfully . . . [p]rocures, counsels, or assists any person to expose such person, or to make any other exhibition of such person to public view or to the view of any number of persons, for the purpose of sexual stimulation of the viewer, . . . shall be guilty, upon conviction, of a felony."

[3]Bray and Huggins allege in their affidavits that they simply informed Mr. Cacy that "the district attorney had determined that criminal charges could be filed against him." Appellant's App. Tab M, at 2; see also id. Tab N, at 2.

speaking with someone at the Pension Board, Bray informed Mr. Cacy that if he resigned, he could collect his pension immediately, but if he were charged criminally, his pension would be "on hold" pending conviction or dismissal of the charges. Mr. Cacy refused to resign immediately, and was suspended with pay effective December 14, 1993.

Mr. Cacy then met with Police Chief Sterling. Mr. Cacy alleges that Chief Sterling said "his hands were tied since criminal charges were being considered." Appellant's App. Tab G, at 3 (Cacy Aff.). According to Mr. Cacy, Chief Sterling also stated: "[T]he City Manager [Larry Shelton] is wanting you gone." Id. Mr. Cacy then asked to see Mr. Shelton, and Chief Sterling allegedly said: "No. He does not want to see you." Id.

On December 16, 1996, Mr. Cacy received notice of a pretermination hearing with Chief Sterling scheduled for December 21, 1993. The notice informed Mr. Cacy that the hearing could result in suspension, demotion, termination, or any other appropriate disciplinary action. The notice also stated:

> At the Hearing you have the right to present evidence and witnesses on your own behalf. You will have the right to question the employer's evidence and witnesses and to ask questions. You are also notified that you have the right to appeal the decision of the Chief of Police to the City Manager within ten (10) days after the receipt of said decision. The determination at this stage shall be final and no further appeal process shall be provided for by the City of Chickasha, Oklahoma.

Id. Tab W. Upon Mr. Cacy's request, the hearing was rescheduled for January 4, 1994. Mr. Cacy states that although he "was given a notice of hearing regarding [his] continued employment," Chief Sterling told him "that the decision had already been made, if [he]

went through with the hearings [he] would be charged criminally and terminated anyway, so [he] should just resign." Id. Tab G, at 3.

After receiving this hearing notice, Mr. Cacy met with an attorney who "questioned whether the District Attorney would in fact file a criminal charge," and informed Mr. Cacy that a court would likely dismiss any criminal charge that might be filed. Id. at 4. However, the attorney advised Mr. Cacy of the high personal and financial costs associated with defending criminal charges, and counseled him to resign. Mr. Cacy then spoke with Assistant District Attorney Robert Beal, who refused to discuss the specifics of Mr. Cacy's case, stating only that he had turned the matter over to District Attorney Gene Christian for prosecution. Mr. Cacy subsequently met with an attorney from the Fraternal Order of Police who further detailed the high costs of defending a criminal prosecution. Mr. Cacy also discussed the matter with his wife. In light of these discussions, and two full weeks after he was suspended, Mr. Cacy decided on December 30 to resign effective January 4, 1994. Id. at 4-5.

In connection with his resignation, Mr. Cacy received a favorable personal letter of recommendation from Chief Sterling. The Fraternal Order of Police publicly honored him, and he was invited to a meeting of the Chickasha City Council to receive his service revolver in recognition of his twenty-two years of service.

Apparently, no charge was ever brought against Mr. Cacy, and the record reveals no effort by Mr. Cacy to contact the District Attorney regarding a disposition of the

matter.  Also, there are no depositions, affidavits, or other evidence to explain the District Attorney's decision not to prosecute Mr. Cacy, or to show the existence of any agreement or understanding between the District Attorney and any individual or agency that criminal charges would not be filed if Mr. Cacy resigned, or would be filed if he refused.

Mr. Cacy brought this action on May 5, 1995, alleging that the defendants conspired to deprive him of his federal constitutional rights with respect to liberty and property, without due process.  He also raised state law claims for intentional and negligent infliction of emotional distress.  On defendants' motion for summary judgment, the district court held:  "Based on the totality of the circumstances, the court can only conclude that plaintiff's resignation was voluntary.  Thus, defendants committed no due process violation."  Appellant's App. Tab D, at 5 (Order).  The court also determined that defendants did not violate Mr. Cacy's liberty interests because the defendants made no false statements about him.[4]  Accordingly, the district court dismissed his federal claims with prejudice, and, pursuant to 28 U.S.C. § 1367(c)(3), dismissed his state law claims without prejudice.

On appeal, Mr. Cacy argues that the district court incorrectly determined his resignation was voluntary because the defendants: (1) forced his resignation by coercion or duress, in part because "the outcome of the hearing before the Chief of Police and City

_____

[4]The court correctly held that it need not address defendants' qualified immunity defenses because plaintiff's due process claims were not actionable.  Appellant's App. Tab D, at 4 (citing Kaul v. Stephan, 83 F.3d 1208, 1213 (10th Cir. 1996)).

Manager was predetermined, final and unappealable," Appellant's Br. at 12; (2) lacked a good faith basis to believe there were grounds for termination; and (3) obtained his resignation by deceiving or misrepresenting material facts to him. He further argues that the district court erred in finding no deprivation of his liberty interests, because the defendants involuntarily discharged him based upon unfounded and "published" charges of dishonesty or immorality.

## II. DISCUSSION

We review de novo the grant of summary judgment and apply the same legal standards as the district court under Fed. R. Civ. P. 56. See Aramburu v. The Boeing Co., 112 F.3d 1398, 1402 (10th Cir. 1997). Under Rule 56(c), a motion for summary judgment is appropriate only if we determine that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." We must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury." Williams v. Rice, 983 F.2d 177, 179 (10th Cir.1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986)). The nonmoving party must make a showing sufficient to establish an inference of the existence of each element essential to the case. Aramburu, 112 F.3d at 1402.

## A.     Property Interest Claim

It is undisputed that Mr. Cacy had a protected property interest in continued employment with the City of Chickasha, and was, therefore, entitled under the Constitution to due process, including a hearing before an unbiased tribunal, in connection with any attempt by the city to fire him. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985). However, he was not fired; he resigned. He contends now that he was constructively discharged by the duress of a threatened criminal prosecution if he did not resign and because the Police Chief and City Manager had already decided to fire him. In this connection, he contends he was denied due process because both of the tribunals available to him for hearings--the Chief, then the City Manager--were biased.

Mr. Cacy attempts to establish an issue of fact on the question of bias by his allegations that Chief Sterling said his hands were tied since criminal charges were being considered, and that the decision concerning Mr. Cacy's employment was already made, so he should just resign. Chief Sterling also allegedly stated that the City Manager, Larry Shelton, wanted Mr. Cacy gone and did not want to see him.[5]

_____

[5]Mr. Cacy also supports his argument with the fact that Captain Bray told Ms. Manuel that he thought "there will be some type of reprimand taken against Officer McCaskill and Lieutenant Cacy." Appellant's App. Tab I, at 11. As it is undisputed that Captain Bray would have no adjudicative function at any hearing for Mr. Cacy, his opinion concerning potential discipline for Mr. Cacy is not material to deciding whether the tribunal was biased.

Mr. Cacy's bias claim is novel in that, although fully represented by counsel, he did not contemporaneously raise any issue of bias, either prior to or at hearings available to him, or immediately thereafter. He resigned before his scheduled pretermination hearing--passing up both that hearing and an appeal hearing before the City Manager--and made no claim of bias until sixteen months later when he filed this action.

Generally, a plaintiff must raise any objection concerning the impartiality of the tribunal when the plaintiff learns of the bias: if he recognizes bias before his hearing, he must contemporaneously object, before or at the hearing; if he recognizes bias only after his hearing, he must then make a timely objection. See McKinney v. Pate, 20 F.3d 1550, 1562 (11th Cir. 1994) (en banc). The reasons are obvious. Among them being: the opportunity for recusal; to make a record; or to clarify the situation both from the standpoint of the hearing officer and the parties, and refute, satisfy, or otherwise address the allegations at the time. Mr. Cacy cites no case to us where a plaintiff resigned, did not pursue the hearings to which he was entitled, and lodged no claim of bias until some later time. Indeed, cases in which a tribunal is available present the opposite situation: the employee claiming bias appears before the tribunal. See, e.g., Patrick v. Miller, 953 F.2d 1240, 1245 (10th Cir. 1992); Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986).

Furthermore, even if, for purposes of argument, Chief Sterling's comments create a jury question as to whether or not he would be impartial in the discharge of his duty as a

pretermination hearing officer,[6] they do not do so as to the City Manager, Mr. Shelton. There is no evidence that Chief Sterling had authority to speak on behalf of Mr. Shelton, who was the final decision maker on Mr. Cacy's resignation, and Mr. Shelton made no statement to Mr. Cacy, his counsel, or counsel for, or any representative of, the union. Nor did any of them seek to communicate directly with Mr. Shelton.

City Manager Shelton is entitled to a presumption of honesty and integrity in the discharge of his duties as an adjudicator in any disciplinary hearing involving Mr. Cacy. "Ordinarily, we presume that public officials have properly discharged their official

---

[6]It must be emphasized that the Chief's role was only to conduct a pretermination hearing, and that Mr. Cacy was entitled to appeal the decision resulting from that hearing, facts made known to Mr. Cacy in a written notice. Mr. Cacy concedes that the City's procedure was facially constitutional. Appellant's Br. at 18. There is no requirement that the pretermination hearing officer be unbiased provided that an impartial decisionmaker is provided at the posttermination hearing. See Gilbert v. Homar, 117 S. Ct. 1807, 1811 (1997) ("[P]retermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story."); Langley v. Adams County, 987 F.2d 1473, 1480 (10th Cir. 1993) (stating adequacy of pretermination procedures must be examined in light of available posttermination procedures); Staton v. Mayes, 552 F.2d 908, 915 (10th Cir. 1977) (stating due process may be satisfied when the state provides an appeal from the pretermination hearing, i.e., the means for an "equitable solution protecting the right to a fair hearing"); see also Clements v. Airport Auth., 69 F.3d 321, 333 n.15 (9th Cir. 1995) ("the decisionmaker in a pre-termination hearing need not be impartial, so long as an impartial decisionmaker is provided at the post-termination hearing"); McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995) (same), cert. denied, 116 S. Ct. 1017 (1996); McKinney v. Pate, 20 F.3d 1550, 1562 (11th Cir. 1994) (en banc) ("in the case of an employment termination ... due process does not require the state to provide an impartial decisionmaker at the pre-termination hearing"); Acosta-Sepulveda v. Hernandez-Purcell, 889 F.2d 9, 12 (1st Cir. 1989) (same); Duchesne v. Williams, 849 F.2d 1004, 1007-08 (6th Cir. 1988) (en banc) (same); Schaper v. City of Huntsville, 813 F.2d 709, 715-16 & n.7 (5th Cir. 1987) (same).

duties," <u>Bracy v. Gramley</u>, 117 S. Ct. 1793, 1799 (1997) (internal quotations omitted), and a person claiming bias on the part of an administrative tribunal "must overcome a presumption of honesty and integrity in those serving as adjudicators." <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 746 (10th Cir. 1991) (quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975)). Moreover, "[d]ue process is violated only when 'the risk of unfairness is intolerably high' under the circumstances of a particular case. Because honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." <u>Mangels</u>, 789 F.2d at 838 (quoting <u>Withrow</u>, 421 U.S. at 58) (citations omitted).

Mr. Cacy's comments attributed to the Police Chief are not enough to call the presumption of regularity into question, especially since Mr. Cacy asserted no claim of bias at the time of the events in issue, or in a hearing. Indeed, by his own account, neither of the lawyers he consulted even mentioned tribunal bias; they focused on the expense of a defense to a criminal prosecution, and damage to his reputation.

With respect to his claims about threats of criminal prosecution, Mr. Cacy makes two arguments: (1) that the defendants coerced him to resign based on groundless threats of criminal prosecution; and (2) that the defendants deceived him into resigning with the

same threats of prosecution.[7]  We are unpersuaded that a genuine issue exists on the

point.[8]  First, Assistant District Attorney Beal told Mr. Cacy directly that criminal charges

*could* be filed against him, and that his case had been turned over to the District Attorney

for prosecution.  These statements overcome any assertion that the defendants deceived

Mr. Cacy regarding the possibility of criminal prosecution.  Second, the District

Attorney's Office and the District Attorney himself are wholly independent of and

separate from the Chickasha Police Department and City Manager, and the decision

whether or not to prosecute Mr. Cacy was a decision to be made by the District Attorney

alone, a fact which could not escape an officer with twenty-two years' experience,

assisted by the counsel of two lawyers.  Furthermore, the conduct of the District Attorney,

---

[7]See, e.g., Hargray v. City of Hallandale, 57 F.3d 1560, 1570 (11th Cir. 1995) (holding "a court may find a resignation to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation"); see also Stone v. University of Maryland Med. Sys. Corp., 855 F.2d 167, 174 (4th Cir. 1988); Scharf v. Department of the Air Force, 710 F.2d 1572, 1575 (Fed. Cir. 1983).  Mr. Cacy alleges, in part, that his resignation was involuntary because Captain Bray misrepresented Assistant District Attorney Beal's opinion that criminal charges *could be filed* by allegedly telling Mr. Cacy that if he "didn't resign immediately [he] *would have criminal charges brought* against [him]."  Appellant's App. Tab G, at 3 (emphasis added).  This argument fails because Mr. Cacy clearly did not rely on this statement when he refused to resign immediately and was suspended with pay.

[8]Mr. Cacy also argues that defendants' public recognition of his service following the resignation shows that they lacked a good faith belief that grounds for termination existed.  The defendants' actions after Mr. Cacy voluntarily resigned do not demonstrate a lack of grounds for termination, but rather a good faith effort to assist Mr. Cacy despite the allegations of his misconduct.

an elected official independent from the City,[9] is also accorded a presumption of honesty, integrity, and regularity. Mr. Cacy does not claim, or advance any facts supporting an alleged conspiracy to deceive existing between the defendants and the District Attorney or his Office. Nor does he allege any substantive due process violation by the District Attorney through misuse of his office by threats of groundless prosecution.

The dissent provides no satisfactory answer to this point, which is that a threatened action by the District Attorney cannot conceivably make the City Manager liable for denying Mr. Cacy due process, absent some sort of conspiracy (which Mr. Cacy does not allege). The potential of an action by the District Attorney and the role that played in Mr. Cacy's decision is entirely external to the defendants in this case. The District Attorney's decision does not affect what the defendants were making available to Mr. Cacy by way of due process any more than if Mr. Cacy decided to retire because his wife wanted to move to another town and threatened to leave him if he decided to go through a hearing.

However, none of the foregoing discussion is conclusive with respect to our disposition of this case. The sole dispositive legal question on appeal is whether or not a jury issue exists as to the voluntariness of Mr. Cacy's resignation. If it was voluntary, he has no cause of action against the defendants. See Parker v. Board of Regents, 981 F.2d 1159, 1162-63 (10th Cir. 1992); Stone, 855 F.2d at 173. We decide this question *de novo*, under the usual summary judgment standards, by examining the totality of the

_____

[9]See Okla. Stat. Ann. tit. 19, § 215.1.

-16-

circumstances, applying an objective test. See Hargray, 57 F.3d at 1568; Parker, 981 F.2d at 1162; Stone, 855 F.2d at 174. Among the circumstances we consider to determine whether the resignation was voluntary are the following: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." Parker, 981 F.2d at 1162 (quoting Stone, 855 F.2d at 174); see also, Lenz v. Dewey, 64 F.3d 547, 552 (10th Cir. 1995).

There is no genuine issue of fact as to the existence of those factors where Mr. Cacy was concerned. Mr. Cacy sought and was given additional time to make a decision, including selecting the date of his resignation. He was in fact in trouble because of the bra incident, and he knew it. The victim, and the tape made by Mr. Cacy's partner, would supply evidence against Mr. Cacy, and he knew that too. And, if the evidence against Mr. Cacy was believed, an indisputably unbiased tribunal would have grounds to fire him for the incident in question. Additionally, regardless of the outcome, publicity likely resulting from the hearing process would at least be highly embarrassing to Mr. Cacy, and could substantially damage his reputation.

Then there was the threatened criminal prosecution by the District Attorney. Mr. Cacy and his lawyers were primarily concerned about this fact, including the expense of defending against a criminal charge. As we have explained, the coercive effect of this

possibility was entirely external to the hearing process offered by the defendants. It is inconceivable that the defendants could be liable for any compulsion Mr. Cacy may have felt with respect to the District Attorney.

Finally, Mr. Cacy sought and received counsel from his own lawyer and the police union's lawyer, both of whom focused on the expense of defending potential criminal charges. He also counseled with his wife. He clearly had alternatives, including pursuing his case administratively, with lawyers at his side to challenge the tribunal if necessary, to make or clarify the record with respect to bias if any existed, and to seek a recusal of one or both of the hearing officers. Whether or not the district attorney chose to pursue charges is, as we have explained, a separate matter; but in any case, Mr. Cacy was free to fight for his job and vigorously defend against any criminal charges. See Stone, 855 F.2d at 178 (holding resignation "represented a carefully considered choice between two unpleasant alternatives, and was therefore, as a matter of law, not an involuntary one").

The dissent argues that an employee can prove a constructive discharge by showing that he or she was faced with a choice between resigning or being fired, citing general cases concerning constructive discharge in sex, age, and handicap discrimination actions under state contract law, Title VII and the ADEA. See, e.g., Black v. Baker Oil Tools, Inc., 107 F.3d 1457 (10th Cir. 1997) (breach of anti-discrimination provision in employment contract); Burks v. Oklahoma Publ'g Co., 81 F.3d 975, 978 (10th Cir.) (age and sex discrimination claims under ADEA and Title VII), cert. denied, 117 S. Ct. 302

-18-

(1996); Spulak v. K-Mart Corp., 894 F.2d 1150 (10th Cir. 1990) (age discrimination claim under ADEA). These cases do not deal with public employees facing disciplinary action, nor do they involve § 1983 actions against public employers, as the present case does.[10]

In the specific cases dealing with involuntary discharge of public employees faced with possible termination, i.e., facts similar to those presented by Mr. Cacy, this court and other circuits have clearly held that we determine whether a resignation was voluntary based on the totality of the circumstances, and that a "choice between resignation or termination does not establish that the resignation was involuntary, unless the employer lacked good cause to believe that there were grounds for termination." Parker, 981 F.2d at 1162; see also Hargray, 57 F.3d at 1568 ("resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges"); Stone, 855 F.2d at 174. The dissent ineffectively attempts to distinguish these cases. The core of the dissent's argument is that Mr. Cacy had no choice at all. That statement simply begs the question by assuming the conclusion. The question here, as we make clear, is whether or not a jury issue exists that Mr. Cacy indeed had no alternative to

---

[10]The dissent also relies on Bailey v. Kirk, 777 F.2d 567 (10th Cir. 1985). While Bailey involves a constructive discharge claim brought under § 1983, the plaintiff there alleged that public employers made his working conditions intolerable, forcing him to resign involuntarily. Unlike the present case, Bailey does not deal with an employee facing a decision between resignation and termination or criminal prosecution, and the specific cases cited in the body of the opinion control Mr. Cacy's claims.

resignation. As we have fully explained, Mr. Cacy's alternatives were resignation or possible criminal prosecution and hearings that could in fact result in his termination and damage to his reputation--keeping in mind that he was indisputably in serious trouble over the bra incident.

Indeed, the specific cases in this area suggest a public employee must show egregious evidence of coercion or duress to show that he was involuntarily discharged, evidence which is indisputably not present in this case. For example, in Angarita v. St. Louis County, 981 F.2d 1537, 1545 (8th Cir. 1992), the court upheld a jury verdict that police officers were denied due process by their public employers. Among other things, the police officers in that case were not allowed to leave an interrogation room until they resigned, they were forced to make their decisions the same day and while defendants interrogated them, they were not permitted to select the date of their resignations, and they were denied requests to speak with their supervisors, families, and attorneys. Id. By contrast, the court in Hargray found the plaintiff's resignation voluntary despite the fact that he had to make decision without the counsel of an attorney, under time pressure, and under threat of criminal prosecution. Hargray, 57 F.3d at 1570.

Accordingly, on the unique facts of this particular case, we conclude, as did the district court, that no jury question exists on the issue of the voluntariness of Mr. Cacy's resignation and, therefore, summary judgment in favor of the defendants was proper.

**B.      Liberty Interest**

Mr. Cacy bases his liberty interest claim on the potential criminal charges of bribery and soliciting an indecent exhibition, arguing that the charges were stigmatizing, false, and published in his employee personnel file and in his suspension letter. Appellant's Reply Br. at 8-9.[11]

Mr. Cacy has a liberty interest in his good name and reputation as it affects his protected property interest in continued employment. See Workman v. Jordan, 32 F.3d 475, 480 (10th Cir. 1994) (citing Paul v. Davis, 424 U.S. 693, 701 (1976)). To demonstrate that the defendants deprived his liberty interest, Mr. Cacy must show the existence of each one of the following four elements:  (1) the statements must impugn the good name, reputation, honor, or integrity of the employee; (2) the statements must be false; (3) the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and (4) the statements must be published. See Workman, 32 F.3d at 481; Arnold v. McClain, 926 F.2d 963, 968 (10th Cir. 1991).

Mr. Cacy has failed to show any false statement concerning his resignation either in the letter suspending him with pay or in the internal affairs investigation report.  First, the suspension letter simply states that Captain Huggins was placing Mr. Cacy on administrative suspension with pay, "pending the outcome of the Criminal Investigation

_____

[11]Mr. Cacy argued before the district court that his liberty interests were deprived by an article in a local newspaper in which a third party said Mr. Cacy was forced to resign.  Mr. Cacy does not pursue this argument on appeal.

involving you, and Officer Jeff McCaskill in a conversation with Teresa Manuel at the local Best Western." Appellant's App. Tab V. There is no dispute that a criminal investigation involving Mr. Cacy was proceeding, and a statement to that effect does not violate a liberty interest. See Primas v. City of Oklahoma City, 958 F.2d 1506, 1510 (10th Cir. 1992).

Second, Mr. Cacy has not identified any statement in the internal affairs investigation report which is false. Rather, he argues: "What is disputed is whether the charges [of soliciting and receiving a bribe and soliciting an indecent exhibition] where (sic) unfounded. As, the Plaintiff and the witnesses to the event each denied that the basis for the accusations against Plaintiff existed, the accusations are denied and not yet proven as true, so they must be false." Appellant's Reply Br. at 8; see also Appellant's Br. at 16. Whether unfounded or not, criminal charges are never mentioned in the internal affairs investigation report. The report contains summaries and transcriptions of interviews with witnesses to the incident, including the transcript of Mr. Cacy's interview, and makes no recommendation concerning termination or criminal charges. Mr. Cacy has not alleged that any of the witnesses lied, or directed our attention to any specific statement that he alleges to be false. Mr. Cacy's belief that the witnesses' statements do not support criminal charges against him does not show that the defendants published false statements which violated his liberty interests.

For the foregoing reasons, the judgment of the district court is AFFIRMED.[12]

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[12]Mr. Cacy does not specifically contest the dismissal of his state law claims. In any event, once the district court dismissed Mr. Cacy's federal claims, it was authorized to dismiss the supplemental state claims as well. See 28 U.S.C. § 1367(c)(3) (permitting district courts to decline supplemental jurisdiction over state law claims where "the district court has dismissed all claims over which it has original jurisdiction"). We therefore find no error in the dismissal without prejudice of Mr. Cacy's state law claims. See Bateman v. City of West Bountiful, 89 F.3d 704, 709 n.5 (10th Cir. 1996).

96-6211, <u>Cacy v. City of Chickasha, Okla.</u> *et al.*
**EBEL, Circuit Judge, dissenting**

In many respects, I agree that the evidence in this case could support the majority's conclusion that Officer Cacy should have done more to protect his rights, rather than simply resigning his position and claiming "constructive discharge." I also agree that the circuit courts have generally held that pre-termination <u>Loudermill</u> hearings do not constitute adjudications and therefore do not require an impartial decision maker. Nonetheless, because I think that the majority failed to view some of the evidence in the light most favorable to Officer Cacy, the non-movant for summary judgment, and failed to afford Officer Cacy the benefit of all reasonable inferences finding support in the record, I dissent.

As the majority notes, a public employee who resigns of his own free will, even though doing so due to the actions of his employer, voluntarily relinquishes his property interest in continued employment and thus cannot be said to have been deprived of that property interest without due process. <u>Parker v. Board of Regents</u>, 981 F.2d 1159, 1162 (10th Cir. 1992). It is also true, however, that "an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired." <u>Burks v. Oklahoma Pub. Co.</u>, 81 F.3d 975, 978 (10th Cir.), <u>cert. denied</u>, 117 S. Ct. 302 (1996)) (citing <u>Acrey v. American Sheep Indus. Ass'n</u>, 981 F.2d 1569, 1573-74 (10th Cir.1992)) (employee was constructively discharged when told to resign or she would be fired); <u>Spulak v. K-Mart Corp.</u>, 894 F.2d 1150, 1154 (10th Cir.1990) (employee was

constructively discharged when faced with choice between early retirement or being fired)); see also Black v. Baker Oil Tools, Inc., 107 F.3d 1457, 1459-60 (10th Cir. 1997) (referring to employee's choice between accepting "voluntary" retirement or a long-term disability leave of absence as a "constructive discharge").  This is because an employee who resigns as the only alternative to being fired cannot be said to have resigned of his or her own free will.  See Parker, 981 F.2d at 1162 (holding that the first factor to be considered in determining whether a resignation was involuntary and coerced is "whether the employee was given some alternative to resignation").

Although the majority holds that our general law of constructive discharge is incompatible with--and thus inapplicable to--our cases involving Section 1983 actions against public employers, I find Parker to be wholly reconcilable with our other constructive discharge cases.  See, e.g. Bailey v. Kirk, 777 F.2d 567, 579 (10th Cir. 1985) (holding, in a policeman's Section 1983 action against an Oklahoma municipality, that "if a plaintiff establishes that he had a protected property or liberty interest of which he was deprived without a due process hearing, his claim that he was forced to resign or was constructively discharged from employment may be actionable under § 1983.") (footnotes and citations omitted).  In Parker, the plaintiff alleged that she was constructively discharged when she was told that if she didn't resign, she would face termination proceedings.  We disagreed, and held that forcing a public employee to choose between resigning and facing dismissal *proceedings* does not constitute constructive discharge,

-2-

unless the employer lacked good cause to believe that there were grounds for termination. Id. at 1162.

The logic of Parker is clear. A state or local government employee with a substantive state law right to job security also enjoys a Fourteenth Amendment right to a Due Process hearing prior to (or subsequent to) the deprivation of that right. Loudermill, 470 U.S. at 542-43. Because the Fourteenth Amendment right *is* the right to a Due Process termination hearing, that right is not violated when the employee is provided with a fair and bona fide opportunity to participate in such a hearing.

In Parker, unlike here, the fairness of the employer's proceedings was simply not at issue. Rather, the Parker court's analysis of the "totality of the circumstances" was peppered with references to the fact that *fair* termination proceedings would have been afforded to the employee, if she had not resigned. See, e.g., Parker, 981 F.2d at 1162 ("Plaintiff was well aware of the nature of the charges and her rights as a tenured employee to due process proceedings."); id. at 1163 ("There is no violation of due process, because plaintiff chose to end her employment without a hearing and not to avail herself of the available due process procedures."). Because Parker did not involve an employee faced with a stark choice between resigning or being fired, I do not read it to conflict with our general law of constructive discharge. In addition, because Parker did not involve an allegation that the available termination proceedings did not comport with Due Process, I do not consider Parker to control the present case.

-3-

In the present case, Officer Cacy was told by Police Chief Sterling--Cacy's direct supervisor and the man scheduled to preside over Cacy's pre-termination hearing--that "the decision had already been made, if [Cacy] went through with the hearings [he] would be charged criminally and terminated anyway, so [Cacy] should just resign." (Aplt.'s App. at G-3 ¶ 29-30). Chief Sterling also told Cacy that City Manager Shelton, who would decide Cacy's post-termination appeal, wanted Cacy "gone" and did not even want Cacy to be allowed to keep his badge and gun if he voluntarily retired. (Id. ¶ 28-29). In my view, these statements support an inference that Cacy was faced with a choice between resigning and being fired. Being offered the alternative of having a hearing before a biased decision maker is no alternative at all because such a hearing is a sham. See Ward v. Village of Monroeville, 409 U.S. 57, 61-62 (1972). Thus, here I believe Cacy was offered no bona fide alternative to resignation.

The majority holds that Chief Sterling's statement that City Manager Shelton was biased against Cacy cannot support the inference that Shelton *was* biased against Cacy. Thus, the majority reasons, Cacy has presented no evidence which could tend to support an inference of Shelton's bias. I disagree.

In my view, Chief Sterling's statement *can*, on a motion for summary judgment, support an inference of Shelton's bias against Cacy. At issue is not whether Sterling was *authorized* to speak on behalf of Shelton, but rather whether Sterling *truthfully* characterized Shelton's attitude towards Cacy. Thus, if Shelton told Sterling that Shelton

-4-

wanted Cacy "gone," and did not even want Cacy to be allowed to carry his badge or service revolver if he retired, then the mere fact that Sterling was not authorized to repeat Shelton's statement to Cacy would not refute the inference that Shelton's statement reflected Shelton's attitude.

If, as we must assume at summary judgment, Shelton was in fact biased against Cacy, then Cacy was never afforded the opportunity for a hearing before an unbiased judge--either before or after his termination. As the majority agrees, such a scenario would not comport with Due Process. See Clements v. Airport Auth. of Washoe County, 69 F.3d 321, 333 n.15 (9th Cir. 1995) ("A pre-termination hearing . . . does not constitute an 'adjudication.' Thus, the decisionmaker in a *pre-termination* proceeding need not be impartial, so long as an impartial decisionmaker is provided at the post-termination hearing.") (emphasis in original) (quoted in majority opinion, at footnote 6); see generally Bracey v. Gramley, 117 S. Ct. 1793, 1797 (1997) ("the Due Process Clause clearly requires a 'fair trial in a fair tribunal' before a judge with no actual bias . . . ."); accord Concrete Pipe & Prods. of Cal. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 617 (1993); Withrow v. Larkin, 421 U.S. 35, 46-47 (1975); Ward v. Village of Monroeville, 409 U.S. 57, 61-62 (1972); Tumey v. Ohio, 273 U.S. 510, 532 (1927).

In addition, the majority holds that the threatened action by the District Attorney could not conceivably make the City Manager liable for denying Cacy Due Process,

absent some sort of conspiracy between the City Manager and the District Attorney (which Cacy does not allege). Slip op. at 16. I respectfully disagree. The City Manager and the other defendants (including the City of Chickasha)[13] may be held liable under Loudermill if they deprived Cacy of his property interest in continued employment without due process of law. Parker, 981 F.2d at 1161 (citing Loudermill, 470 U.S. at 538). For the reasons discussed above, I think that Cacy has presented evidence of the City Manager's bias sufficient to survive summary judgment on the Due Process issue, *if* Cacy was constructively discharged. See Parker, 981 F.2d at 1162. If however, Cacy was not constructively discharged, then I would agree with the majority that his resignation would preclude him from stating a claim under 42 U.S.C. § 1983.

The credible threat of criminal prosecution if Cacy did not resign is, in my view, relevant to the issue of the voluntariness of Cacy's resignation and therefore relevant in

---

[13]A state prosecuting attorney acting within the scope of his employment enjoys absolute immunity from civil liability under both 42 U.S.C. § 1983 and Oklahoma law. See Imbler v. Pachtman, 424 U.S. 409, 410, 431 (1976) (42 U.S.C. § 1983); Powell v. Seay, 553 P.2d 161, 163-64 (Okla. 1976) (Oklahoma law). Thus, Cacy was barred from naming anyone in the district attorney's office as a defendant in the present action. Under certain circumstances, however, a local government may be held liable under 42 U.S.C. § 1983 for a prosecuting attorney's actions. See Taylor v. Meacham, 82 F.3d 1556, 1560-61 (10th Cir.)(recognizing that Section 1983 claim may be brought against County government for malicious prosecution if the prosecution involves a constitutional violation) (citing cases), cert. denied, 117 S. Ct. 186 (1996). While I agree with the majority that the evidence in the present case does not give rise to an inference that the Chickasha district attorney's actions rose to the level of a constitutional violation, I do not agree that the district attorney's actions could not "conceivably" make the City of Chickasha liable absent a conspiracy between the district attorney and another city official.

determining whether Cacy was constructively discharged. See Parker, 981 F.2d at 1162. ("A resignation will be involuntary and coerced when the totality of the circumstances indicate the employee did not have the opportunity to make a free choice."). Courts, including this court, have found such threats to contribute to the involuntariness of government employees' resignations. See, e.g., Bailey v. Kirk, 777 F.2d 567, 579 & n.15 (10th Cir. 1985) (holding that an Oklahoma policeman was constructively discharged and permitting him to bring an action under 42 U.S.C. § 1983 where, *inter alia*, the City Manager and the Chief of Police used their positions to induce others to lodge criminal charges against policeman); see also Bishop v. Tice, 622 F.2d 349, 352, 354, 357 (8th Cir. 1980) (permitting former federal OSHA employee, after resigning his position, to bring Bivens-type action for procedural due process violation after being threatened with criminal charges if he did not resign), appeal after remand, 704 F.2d 417 (8th Cir. 1983).

As the majority acknowledges, Chief Sterling told Cacy that Cacy would be criminally prosecuted if Cacy didn't resign. Subsequently, Assistant District Attorney Beal told Cacy that criminal charges could be filed against Cacy, and that Cacy's case had been turned over to the District Attorney for prosecution. Finally, after Cacy decided to resign, no criminal charges were filed against him.

Certainly, this sequence of events could support an inference that the District Attorney independently evaluated the merits of the criminal case against Cacy, and decided that the evidence did not warrant prosecution. However, I believe that it could

also support an inference that the District Attorney waited to see whether Cacy would resign, in order to decide whether to bring criminal charges against Cacy. On summary judgment, we must accept the latter inference because all inferences must run in favor of the party opposing the summary judgment.[14]

This inference does not depend on the existence of a "conspiracy" between Chief Sterling, City Manager Shelton, and/or the district attorney's office. Rather, Chief Sterling's statement to Cacy could have been based on accurate information about the district attorney's intentions which had been communicated to Chief Sterling through normal and legitimate channels. Alternatively, the statement could simply have been an expression of Chief Sterling's own opinion, or a prediction, based on his experience working with the district attorney. In either of these contexts, Cacy could reasonably have believed that the statement was true. Indeed, Cacy's twenty-two years of experience with the Chickasha Police Department would have provided him with the opportunity to observe the working relationship between the department and the district attorney's

---

[14]Logically, a third possible inference is that Chief Sterling's comments were false and without basis. This inference would also support Cacy's constructive discharge claim. See Hargray v. City of Hallandale, 57 F.3d 1560, 1570 (11th Cir. 1995) ("a court may find a resignation to be involuntary if induced by an employee's reasonable reliance on an employer's misrepresentation of a material fact concerning the resignation. A misrepresentation may be material if it concerns an alternative to resignation, *such as the possibility of criminal prosecution*") (citations omitted and emphasis added). However, neither party urges this interpretation of Chief Sterling's comments upon us, and I agree with the majority that the evidence in the present case does not tend to suggest that Chief Sterling's comments were deceptive or misleading.

office, and might have rendered Cacy particularly capable of evaluating the likely accuracy of Chief Sterling's prediction.

In my view, a reasonable person, wholly innocent of all wrongdoing,[15] would not have attempted under the present circumstances "to fight for his job and vigorously defend against any criminal charges." Slip op. at 19. Rather, even an innocent person would have resigned rather than face costly and aggravating (though meritless) criminal proceedings, coupled with biased pre-termination and post-termination proceedings with pre-determined outcomes. Thus, in my view, "the totality of the circumstances indicate [Cacy] did not have the opportunity to make a free choice." Parker, 981 F.2d at 1162 Although, as the majority acknowledges, Cacy plainly enjoyed a constitutional right to a fair hearing before an unbiased arbiter prior to or subsequent to his termination, Cacy would have been punished by a criminal prosecution had he merely attempted to make a record establishing that this right was being denied to him. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional." Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (citations and internal quote marks

---

[15]The defendants, of course, argue that Cacy was not wholly innocent of all wrongdoing, but rather was already in trouble because of the incident involving Ms. Manuel. Under Cacy's account of the facts, however, his conduct throughout that incident was indeed wholly innocent, and the charges lodged against him were false. At summary judgment, we must accept Cacy's factual account of the relevant events.

omitted); cf. Garrity v. New Jersey, 385 U.S. 493, 497-98 (1967) (choice given police officers "either to forfeit their jobs or to incriminate themselves . . . is [so] 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice' [that it] cannot be sustained as voluntary under our prior decisions.") (quoting Miranda v. Arizona, 384 U.S. 436, 464-65 (1966)).

In short, I believe that Chief Sterling's statement to Cacy that "the decision had already been made, if [Cacy] went through with the hearings [he] would be charged criminally and terminated anyway, so [Cacy] should just resign," along with the other evidence in the record, could support the inference that the decision had already been made, and that if Cacy went through with the hearings he would be charged criminally and terminated anyway. Because I believe that this inference, if accepted as true by the trier of fact, would be sufficient for Cacy to establish both "constructive discharge," see, e.g., Bailey, 777 F.2d at 579-80, and a violation of Due Process, see, e.g., Clements, 69 F.3d at 333 n.15, I believe it was inappropriate to resolve this case upon summary judgment for the defendants. Therefore, I respectfully dissent.